*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| v. | ) | *Criminal No. 05-86-P-H* |
| | ) | |
| *JOSEPH PARSLEY,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

The defendant, Joseph Parsley, charged with conspiracy to import into the United States from Canada a mixture or substance containing marijuana and to aid and abet the commission of that offense, in violation of 21 U.S.C. § 963, and conspiracy to distribute and possess with intent to distribute a mixture or substance containing marijuana, in violation of 21 U.S.C. § 846, Indictment (Docket No. 1) at 1-2, moves to suppress evidence seized on July 20, 2004 as the result of a traffic stop of a van driven by the defendant, Motion to Suppress ("Motion") (Docket No. 110) at [1].[1] An evidentiary hearing was held before me on May 3, 2006, at which the defendant appeared with counsel. The parties have submitted post-hearing briefs. I now recommend that the following findings of fact be adopted and that the motion to suppress be denied.

**I. Proposed Findings of Fact**

In 2004 Bruce Gauthier, then a special agent with the U. S. Bureau of Immigration and Customs Enforcement ("ICE") assigned to Portland, Maine, was investigating the smuggling of marijuana into Maine. In the course of his investigation he spoke with two individuals who had been arrested on

---

[1] Counsel for the defendant is reminded that all memoranda pages are to be numbered at the bottom. Local Rule 147(e).

1

March 23, 2004 and who were involved in smuggling marijuana which they picked up at 606 Main Street in Grand Isle, Maine. This address was on the St. John River, which is the boundary between Canada and the United States. The first of the two individuals had picked up marijuana at this address five or six times and delivered it elsewhere. The second individual had picked up marijuana at this address two or three times and delivered it elsewhere. The two individuals agreed to participate in a controlled delivery the next day, March 24, 2004, in Portland, Maine.

The first individual contacted a woman from Montreal, later identified as Joelle Leblanc, and agreed to meet at a Denny's restaurant in Portland. Both individuals met with Leblanc as planned and gave her the four hockey bags of marijuana with which they had been arrested. Leblanc put three of the bags in the trunk of her vehicle and one in the back seat. She was later apprehended in this vehicle.

On July 8, 2004 Gauthier was involved in the surveillance of individuals who were ultimately arrested. He went to Grand Isle, Maine because two rental vehicles under surveillance the night before at the Gateway Motel in Madawaska, Maine had left the motel at 1:00 a.m. and had been followed to 606 Main Street in Grand Isle, where they went down the long driveway to a residence that was not visible from Main Street. Starting at 4:00 or 5:00 a.m., the two vehicles left 606 Main Street and traveled south on Route 1, which is also Main Street in Grand Isle. The Maine state police stopped both vehicles after they had traveled 60 to 70 miles. Gauthier was present for the last part of these traffic stops.

Both drivers gave consent to search their respective vehicles. One had three hockey bags of marijuana identical to those seized earlier, holding a total of approximately 60 pounds of marijuana. The other had four hockey bags holding about 120 pounds of marijuana. The driver of the first vehicle said that he had previously transported marijuana three times from 606 Main Street in Grand Isle to

Portsmouth, New Hampshire where he gave the marijuana to an individual whom he could not identify. He said that he had been doing this once a week, since approximately June 1, 2004. He said that the marijuana was always in identical hockey bags. The driver of the second vehicle said that he had transported marijuana from 606 Main Street in Grand Isle once to Portsmouth, once to Boston and once to Bangor, Maine.

On July 19, 2004 Gauthier established surveillance at Martin Ford in Fort Kent, Maine because he had been informed by a source that cars would be rented there that day. The driver of one vehicle rented that day went to K-Mart and then to the Gateway Motel, checking in at approximately 3:00 p.m. After Gauthier observed the cars being rented, a source called him and gave the name of the renter as Steven Theriault, with an address in Green River, New Brunswick. The driver left the Gateway Motel at 1:00 a.m. July 20 and drove alone to 606 Main Street in Grand Isle, where he stayed for six hours. He then drove south on Route 1 and, after brief stops in Millinocket, Maine and Seabrook, New Hampshire, eventually reached Portsmouth, New Hampshire, where, after driving around for several hours, he entered the driveway of the Meadowbrook Inn on the traffic circle. As that vehicle entered the driveway, a blue mini-van with out-of-state license plates (later more specifically identified as a blue Astro Van) exited from the driveway, went into a parking lot directly across the street, turned around and went back into the Meadowbrook Inn parking lot.

Theriault went into the lobby of the Meadowbrook Inn and then into a room. John Coleman, a senior special agent with ICE in the Boston office, was assigned to assist in the investigation in Portsmouth on July 20. He drove to Portsmouth with a Massachusetts state trooper. He performed surveillance on a gray Taurus, the car used by Theriault, and then on a blue Astro Van. At around 11:00 p.m. Coleman was sitting in his vehicle about 50 yards from the door of the room Theriault had entered earlier. He could see that a light was on in the room. Coleman observed a person come

3

around the corner, pass three doors and knock on Theriault's door, where he was let in. This person left the room three or four minutes later. Coleman could not tell whether the person was carrying anything. The man walked down the road away from the Meadowbrook Inn, crossed a stream, and got into the Astro Van in the parking lot of the Fairfield Inn. Coleman and his partner followed the van when it drove off.

Theriault left the room at about 11:30 p.m. and drove through the parking lot of the nearby Holiday Inn and parked in the adjacent lot of the Best Western motel. Gauthier arranged to have a marked Portsmouth cruiser approach the vehicle and to have its officer request identification from Theriault. Gauthier approached the vehicle about five minutes later, identified himself and asked Theriault about his erratic driving. Theriault said that he was traveling to Boston and had been trying to find his telephone card. He denied having drugs or weapons. Three times Theriault gave consent to search his vehicle.

In plain view on the back seat of Theriault's vehicle was a large black hockey bag; there were three more such bags in the trunk. One of the bags in the trunk was ripped and Gauthier could see in it a clear plastic bag containing what appeared to be marijuana. Theriault also had two cell phones. He had been seen using a cell phone several times so the phones were searched for recent activity. There were a large number of calls noted in the activity log as having been received and made on July 20. Theriault was not arrested on July 20.

Gauthier was advised that a blue mini-van with Pennsylvania license plates that was under surveillance left I-95 at Exit 7. He requested that a marked police unit stop the van. This was done and immediately thereafter Coleman and his partner arrived. The defendant, who had been driving this van and was its sole occupant, was standing outside the van speaking with a uniformed officer. No guns had been drawn. Coleman introduced himself to the defendant and told him that he had been

pulled over in connection with a drug investigation and asked whether he could ask the defendant some questions. The defendant responded, "No problem."

In response to Coleman's questions, the defendant said that he was coming from a hotel that he could not name and that he was in Portsmouth to meet a girl whom he had contacted on the internet. He could not describe the girl nor remember the name of the dating service he had used. He then said that he had gone to the Meadowbrook Inn to use the bathroom. He said that he knocked on a door and someone let him in to use the bathroom. Coleman asked why the defendant had not used the bathroom in the motel lobby; the defendant did not respond. Coleman asked why the defendant had not urinated outdoors; again the defendant did not respond. Coleman asked why the defendant had passed several doors before knocking on Theriault's door; the defendant did not respond. Coleman asked why the defendant had walked from his van to the Meadowbrook Inn to find a bathroom rather than driving his van into the Meadowbrook Inn parking lot; the defendant did not answer. Coleman and the defendant talked for ten to twenty minutes on the curb. Towards the end of the conversation the defendant asked if he was under arrest and Coleman said, "No." After Coleman observed that it was a long way to come from Pennsylvania to New Hampshire for a date and this was not making sense to him, the defendant said that he would prefer to talk to a lawyer. At this point Coleman stopped questioning the defendant.

Agent Don Lindsay told Coleman by telephone that between 120 and 160 pounds of marijuana had been found in Theriault's vehicle and that Theriault had two cell phones. He said that their main objective was to get consent to search the defendant's cell phone to see whether there had been calls between that phone and one of Theriault's phones, as they anticipated. The individuals arrested earlier had said that they used prepaid cell phones during their travels to determine meeting locations.

5

Records of the cell phones used by those individuals had been subpoenaed. The records for Theriault's cell phones were obtained as well.

The local police had a drug dog on the scene and did an exterior search of the defendant's van. The dog alerted to something in the van, which was then searched by a state police officer. Coleman was told that some residue of white powder and seeds were found on a ten-dollar bill in the van. There were several Christmas-tree-type air fresheners in the van, causing a choking odor. The air freshener would not affect the dog's ability to identify illicit drugs. The dog's handler could see green vegetative matter on a rug inside the van. Coleman also searched the van with the Massachusetts state trooper and retrieved a cell phone from the front console. About five minutes after the defendant had asked for a lawyer, Coleman approached the defendant, who said that the cell phone was his. Coleman asked if he could go through the cell phone and the defendant replied, "Do whatever you want. I don't care."

Coleman then relayed numbers that had been called from the defendant's cell phone and numbers in its address book to Gauthier. About ten or fifteen minutes after the defendant had asked for a lawyer, at 12:20 a.m., the cell phone then began ringing and Coleman asked the defendant, "Do you mind if I answer the phone?" The defendant replied, "Do whatever you want." Coleman answered the cell phone and said, "Hello." A voice with a thick French accent said, "Hello. How are you? Have you met my friend yet?"

The defendant was not arrested. He left the scene in his van after approximately a half hour. He was not advised of his *Miranda* rights at any time during the stop.

When the defendant was later arrested on November 4, 2005, as part of the booking process he provided the number of his cell phone, which was listed among those called in the records of one of the cell phones used by Theriault.

## II. Discussion

The defendant first contends that his van "was stopped without any articulable basis of criminal activity." Motion at [3]. A police officer "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). Officers who have "at least an articulable and reasonable suspicion that [the defendant] was engaged in criminal activity" may effect an investigative *Terry* stop. *United States v. Trueber*, 238 F.3d 79, 92 (1st Cir. 2001) (citation omitted). In such circumstances, a vehicle may be stopped and its occupants detained for a period of investigation. *Id*. In addition,

> [u]nder the "fellow-officer" rule, law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime.

*United States v. Meade*, 110 F.3d 190, 193 (1st Cir. 1997) (citation omitted).

The defendant asserts that the officers in this case did not have an adequate reasonable suspicion of criminal activity on his part before they stopped his van. Post Hearing Brief on Motion to Suppress ("Defendant's Post Hearing Brief") (Docket No. 139) at [1]. This is so, he contends, because: (i) the driver who was followed from Grand Isle to Portsmouth was at 606 Main Street in Grand Isle for six hours, "not . . . a quick drug pickup;" (ii) the fact that that the defendant's van was seen leaving the Meadowbrook Inn parking lot at the time Theriault was entering it was "a perfectly innocent occurrence;" (iii) "[t]here was no identification of Defendant going into the motel room;" (iv) the person who left the hotel room was not carrying anything; (v) Coleman was too far away to identify the van which the walker entered after leaving the hotel room; (vi) there is no testimony "relating any traffic infractions or other bases for the stop of the [defendant's] vehicle;" and (vii) the marijuana was not discovered in Theriault's vehicle until after the defendant had been pulled over. *Id*. at [1]-[2].

7

The evidence establishes that the officers who stopped the defendant's van knew that (i) its driver was seen walking to the Meadowbrook Inn, where he went directly to the room occupied by the man who had driven to Portsmouth from Grand Isle in a vehicle rented from the dealership identified by the informant as the rental locus, which vehicle had spent time at an address from which marijuana was known to be distributed; (ii) its driver left this man's room after only three or four minutes and walked several hundred yards to the van, which was parked in the lot of a different motel, and then drove off; (iii) the van was followed from the moment it drove off until it was stopped; (iv) the man who rented the room at the Meadowbrook Inn had rented a room the previous night in the Gateway Motel in Madawaska, where others known to have distributed marijuana from the Grand Isle house were known to have stayed; (v) marijuana had previously been recovered from vehicles leaving the Grand Isle house; and (vi) the van had Pennsylvania license plates. It was not necessary that Coleman have observed the defendant carrying something that could possibly contain marijuana away from Theriault's motel room in order for the defendant's van to be stopped a few minutes later. The officers had adequate, articulable and reasonable suspicion of criminal activity on the defendant's part to allow them to stop his van late on the night of July 20, 2004. *See generally United States v. Monteiro*, __ F.3d __, 2006 WL 1195685 (1st Cir. May 5, 2006), at *2.

The defendant next argues that "the length of the detention was not warranted based upon the circumstances relating to the stop." Defendant's Post Hearing Brief at [2]. He asserts that the stop "occurred at 11:39 p.m." and that he "was still being detained well after 12:20," when Coleman answered the call that came in to the defendant's cell phone. *Id*. He contends that the fact that he "gave conflicting facts relative to his presence in the area . . . does not justify an investigatory stop of approximately one hour." *Id*. He concludes that all of the evidence "gained pursuant to the search of his vehicle" should therefore be suppressed. *Id*. at [3]. This argument was not made in the

8

defendant's initial motion and the government has not had the opportunity to respond to it. The defendant cites no authority in support of his position. While an "overly prolonged . . . detention" may render a lawful *Terry* stop unlawful, the emergence of new knowledge over time — here, the defendant's conflicting statements, the drug dog's alert, the powder and vegetative debris found in the van and the statement by the caller when Coleman answered the defendant's cell phone — justified continued detention. *United States v. Lee*, 317 F.3d 26, 31(1st Cir. 2003) (following initiation of investigatory stop passage of time brought with it new knowledge — discovery of bogus credit cards in defendant's wallet and sighting of newly-acquired merchandise inside vehicle — that escalated level of suspicion justifying continued detention). Stops of a similar length have been upheld by the First Circuit. *E.g., United States v. Owens*, 167 F.3d 739, 748-49 (1st Cir. 1999) (50 minutes); *United States v. McCarthy*, 77 F.3d 522, 530-31 (1st Cir. 1996) ("there is no talismanic time beyond which any stop initially justified on the basis of *Terry* becomes an unreasonable seizure under the [F]ourth [A]mendment;" 75 minutes).

      The defendant moves on to contend that his alleged consents to the search and answering of the cell phone were invalid because they occurred after he had invoked his right to counsel. Motion at [3]; Defendant's Post Hearing Brief at [3] – [5]. He cites *Davis v. United States*, 512 U.S. 452 (1994), and *United States v. Ortiz*, 177 F.3d 108, 110 (1st Cir. 1999), in support of his position that any consent to search given after the right to counsel is invoked is *per se* invalid and requires suppression of any evidence so obtained. Motion at [3]. The government responds that asking for consent is not tantamount to interrogation and cites, Government's Supplemental Brief on Defendant's Motion to Suppress Evidence ("Government's Supplemental Brief") (Docket No. 135) at 5-6, three cases in support of its argument to the effect that consent to search obtained after a defendant invokes his right to counsel is not invalid, *Dotson v. Lewis*, 2006 WL 862946 (N.D.Cal. Mar. 31, 2006);

9

*United States v. Knight*, 58 F.3d 393 (8th Cir. 1995); and *United States v. Roa*, 24 M.J. 297, 298 (C.M.A. 1987).

*Davis* deals only with the invocation of the right to counsel in the context of interrogations. 512 U.S. at 458-59. It cannot be stretched to apply to a request for consent to search, particularly when several federal courts of appeals have issued opinions holding that asking for consent to search is not interrogation. *See, e.g., United States v. LaGrone*, 43 F.3d 332, 335 (7th Cir. 1994); *United States v. Hidalgo*, 7 F.3d 1566, 1568 (11th Cir. 1993); *United States v. Rodriguez-Garcia*, 983 F.2d 1563, 1568 (10th Cir. 1993) (and cases cited therein). The same is true of *Ortiz*, the only other authority cited by the defendant; that case also dealt only with a resumption of interrogation after the defendant had invoked his right to counsel. 177 F.3d at 110. Here, the defendant does not contend that his consent to the search of his cell phone was involuntary, or that it was unlawful, for any reason other than that it was given after he invoked his right to counsel. That argument rests on an incorrect statement of legal principle. The defendant is not entitled to suppression on this basis. *United States v. Knight*, 58 F.3d at 397-98 (consent to search hotel safe deposit box; prohibition against further interrogation once person in custody invokes right to counsel doesn't apply to voluntary consent to search for physical evidence); *Dotson v. Lewis*, 2006 WL 862946 at *4 (defendant consented to search of home 30 minutes after invoking right to counsel; request for consent to search not "interrogation" within meaning of *Edwards*).

The defendant attacks Coleman's credibility at some length. Defendant's Post Hearing Brief at [4]-[5], [7]-[8]. I do not find Coleman's testimony to be inherently incredible, and no evidence contradicting his version of events was offered.

My conclusion that the defendant consented to Coleman's search of his cell phone and Coleman's answering of an incoming call makes it unnecessary to resolve the questions whether a

10

warrant was required in order for Coleman to answer the cell phone and whether a cell phone found in a vehicle is a container subject to search incident to the search of the vehicle. I do note, however, that at least two courts have determined that a cell phone or similar device found during a vehicle search may itself be searched. *United States v. Ball*, 2005 WL 2649496 (W.D. Mo. Oct. 14, 2005), at *4; *United States v. Woodley*, 2005 WL 3132205 (E.D.Mich. Nov. 22, 2005), at *5 -*8 (search and seizure of two-way pager found in searched vehicle justified under "automobile exception" to warrant requirement).

The defendant next argues that "probable cause did not exist to search the vehicle." Defendant's Post Hearing Brief at [5]-[6]. He asserts that his answers to Coleman's questions "certainly did not establish probable cause" and that the drug dog's alert did not establish probable cause because only an unspecified amount of residue of two different drugs was found. *Id*. at 5. But it is not what is found during the search that establishes whether there was probable cause to conduct the search at the time it started. The alert of a drug dog before the search, as was the case here, does provide sufficient probable cause for the search of a vehicle. *E.g., United States v. Dortch*, 199 F.3d 193, 197 (5th Cir. 1999); *United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994).

### III. Conclusion

For the foregoing reasons, I recommend that the foregoing proposed findings of fact be **ADOPTED** and the defendant's motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de</u> <u>novo</u> review by the district court and to appeal the district court's order.*

Dated this 23rd day of May, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge